ANDREWS *v.* BREWSTER *et al.*

(*Supreme Court, General Term, First Department.* February 14, 1890.)

1. RELEASE—PAROL EVIDENCE—CONSIDERATION.
   Defendant's testator, to procure the release of a claim against him for loss of rents upon the settlement of his deceased brother's estate, of which he was trustee, orally agreed with plaintiff, one of the distributees, that if she would sign a general release she would lose nothing, as he would leave her an equal share of the bulk of his estate with his nephew and niece. *Held*, that the agreement was not inconsistent with, and did not directly or indirectly contradict or destroy the legal effect of, the release, so as to exclude evidence thereof.

2. CONTRACT TO MAKE WILL—BREACH—MEASURE OF DAMAGES.
   In an action for breach of said agreement, the measure of damages is the amount of testator's estate which under the agreement should have been devised to plaintiff, and not the amount of the rents lost, for which the release was given.

Motion for new trial on exceptions.

Action by Blanche L. Andrews against William G. Brewster and Randolph W. Townsend, as executors, etc., of Seabury Brewster, deceased. Defendants' exceptions, taken on trial at circuit, were ordered to be heard in the first instance at the general term.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Butler, Stillman & Hubbard,* (*William Allen Butler,* of counsel,) for plaintiff. *B. F. Einstein,* (*A. R. Dyett,* of counsel,) for defendants.

VAN BRUNT, P. J. Mr. Seabury Brewster, whose executors are the defendants in this action, was for many years prior to his death, which occurred on September 20, 1884, a resident of the city of New York. He was a bachelor, and was one of a family of eight children, six brothers and one sister, all of whom are now deceased. One of his brothers, Christopher Starr Brewster, took up his residence in Paris, France, prior to 1870. He was possessed of large means, most of which he left in the hands of his brother Seabury Brewster for administration. During his life-time he and Seabury Brewster became jointly interested in a large quantity of real estate in the city of New York, the title to which, however, stood in the name of Seabury Brewster. This real estate consisted of the premises No. 29 Park row, 535 Broadway, and 627 and 629 Broadway. In 1870 a settlement was had between the brothers in respect to this real estate, and a written agreement was made as of January 1, 1870. By this agreement it was provided that C. S. Brewster was to take the parcels 29 Park row and 535 Broadway, and Seabury the parcels 627 and 629 Broadway, on the basis of the valuation of the tax assessors. No. 29 Park row and 535 Broadway were taken at a valuation of $122,000, and Nos. 627 and 629 Broadway at a valuation of $170,000. On this basis Christopher S. Brewster's one-half of the premises allotted to him was valued at $60,000, while the one-half of the other premises allotted to Seabury Brewster was valued at $85,000. These amounts were equalized by Seabury Brewster's crediting him in general account with the sum of $24,000, thus closing all their real estate transactions. The agreement provided that, until otherwise directed by Christopher Starr Brewster, Seabury Brewster should continue the care and management of No. 29 Park row and 535 Broadway, as theretofore, but for the benefit and account of Christopher Starr Brewster solely. Seabury Brewster executed two deeds,

conveying the premises No. 29 Park row and 535 Broadway to Christopher S. Brewster in fee. These deeds, however, were never recorded, and were subsequently canceled. Christopher S. Brewster died in Paris in December, 1870, leaving a widow, Anna Maria Brewster, and three children, Louis S. J. Brewster, Henry B. Brewster, and Mary Catherine Brewster. Louis S. J. Brewster was the only one of these children who was of age at their father's death. He came of age in April, 1870. Henry B. Brewter came of age on the 8th November, 1871, and Mary Catherine Brewster in March, 1877. Christopher S. Brewster left a last will and testament, duly executed, on the 26th of February, 1858, with a codicil executed on July 17, 1858; but they were not proved until June, 1888, 18 years after the death of the testator, and 4 years after the death of Seabury Brewster, the executor and trustee therein named. By this will Christopher S. Brewster appointed his wife, and his brother Seabury Brewster, and his brother-in-law J. Henry Bennett, of London, his executors; and, after a bequest of personal effects to his wife, he gave all his property, real and personal, to his executors, in trust to be deemed divided in shares equal in number to two more than the number of his children living at his death, the income of one of such shares to be paid to his wife during life, of one other of such shares to his brother Seabury, and of the residue so much as his wife should deem necessary for the maintenance and education of his children to be paid to his wife, and the remainder accumulated during the minority of each child, who, on attaining full age, was to receive the principal of one share, with all its accumulations. On the death of his wife and brother, respectively, the shares set apart for their benefit were to go to the testator's children. By the codicil, power was given to his executors to bear and pay one-half of the expense of building on the real estate in which he was jointly interested with his brother Seabury Brewster, if it should become expedient or desirable to build upon or otherwise improve the said real estate. It is to be observed that this will and codicil both bear date prior to the time of the partition of the real estate hereinbefore mentioned as having occurred in 1870.

After the death of Christopher S. Brewster, Seabury Brewster continued to manage the real estate as the ostensible owner, except for a short period, the record title remaining in him as such, and he also collected the interest and dividends on the stocks and bonds belonging to the estate. The only change made in the method of doing business was that Seabury Brewster kept the general account with "C. Starr Brewster's estate," instead of "C. Starr Brewster," and accounted for and paid over the income to the widow for herself and the minor children, and to the children, respectively, after they came of age, according to the directions of the will as to the several interests created. In 1873 the widow of Christopher S. Brewster died in Vienna, and in October of that year Louis S. J. Brewster married Blanche Landgraf Vance, the plaintiff in this action. Louis S. J. Brewster died in April, 1879, leaving his widow, the plaintiff in this action, and no children. By his will, which was dated October 8, 1873, and which was admitted to probate, he devised and bequeathed all his property to the plaintiff, and appointed her executrix. The plaintiff afterwards, in 1881, married Constant A. Andrews. Henry J. Brewster and Mary Catherine Brewster, called familiarly in the family Harry and Kate, had attained full age, and the last named had married M. de Terrouenne, a citizen of France. Henry J. Brewster appears to have lived in France. From the time of the death of Christopher S. Brewster, as above stated, Seabury Brewster did nothing in reference to proving his will or dividing the estate. He went on as before, and retained everything in his hands, including the continued management of No. 29 Park row and 535 Broadway, except for a short period of time. He made up inventories of the estate of Christopher S. Brewster from the 1st of January in each year from 1872 to 1881; and for most of the time, although it appears from the evidence

that the rental value of the premises was large, they were allowed to stand idle, not being rented. The motives of Seabury Brewster in refusing to rent the Park row and Broadway buildings do not seem to be very apparent.

After her marriage to Mr. Andrews, the plaintiff was traveling in Europe with her husband. Previous to this time, and while the plaintiff was in New York during her first marriage and her widowhood, and while she resided in the same house with her brother-in-law John E. Roosevelt, a member of the New York bar, she had made complaints, through Mr. Roosevelt, to Seabury Brewster, of the non-renting of the Park-row and Broadway property. Mr. Roosevelt during these years spoke to Seabury Brewster on the subject, calling his attention to the loss and injury he was occasioning to the estate by leaving the property unrented. In 1881 Seabury Brewster began to take steps towards what he called a settlement of the estate of his deceased brother. Some three weeks prior to the 9th of May, 1881, Mr. Roosevelt had an interview with him, in the course of which he said he proposed making a distribution of C. S. Brewster's estate, and wanted him to use his influence to persuade Mrs. Andrews to put her share in trust. He stated that the other children, Harry and Kate, were going to leave their securities with him, and that he would collect the interest, and send it over to them the same as before. Mr. Roosevelt then asked him what he was going to do; what arrangement he would make about the back rents. He said that would be all made up to her and the others at his death, and that she would share equally in his estate, and receive the bulk of it; that he was going to make a little provision for William, who had been very kind to him. He was also going to remember Mr. Cook, and possibly a few others, in small amounts, but that they were to receive the bulk of it. Mr. Brewster further said that the plaintiff was the same to him as his niece; that she stood in exactly the same position to him as Louis did; and that, although she was not by blood his niece, she was in fact so, that he so regarded her, and that she was to him just as much as the other two. Mr. Brewster further enlarged upon the desirability of her share being put in trust, as she was a married woman. Mr. Roosevelt answered that it would be useless to make such a proposition; that the plaintiff would not take any suggestion of that kind; and that, if there was to be any distribution, it must be an actual one. Mr. Roosevelt then states that he thinks Mr. Brewster said that he was a bachelor; that these were his nearest relatives; that he could not live much longer, so that they would very soon have this all made up to them.

As a result of this conversation, Mr. Roosevelt cabled to the plaintiff to come here, which she did, arriving on the 4th of May, 1881. Mme. de Terrouenne also came to the United States temporarily in 1881, and was here at the same time. Seabury Brewster had in the mean time prepared a written statement of the estate, and a plan of division, for the heirs to approve. Upon Mrs. Andrews' arrival, Seabury Brewster came to see her immediately. The next day but one she had an interview with him at his office, 629 Broadway. Subsequently she had further interviews, at some of which her husband and Mr. Roosevelt were present, and at others only herself and Mr. Brewster. Mr. Andrews and Mr. Roosevelt had interviews with Mr. Brewster, at which the plaintiff was not present. They communicated to her what passed at these interviews. Mr. Seabury Brewster exhibited schemes of proposed settlements and accounts, and the question as to the making good to the plaintiff for the non-collection of rents was also discussed. Mme. de Terrouenne and Henry B. Brewster approved and consented to the proposed distribution of the estate as contained in these accounts, and agreed to execute the proper papers; but whether this consent was upon the accounts at the time they were submitted to the plaintiff or not does not distinctly appear. The result of these interviews seems to have been that Seabury Brewster stated that if the plaintiff would accept the amount shown as due her, and

execute the papers as desired, she would lose nothing; that he would make her a co-heir with Harry and Kate, his nephew and niece. Seabury Brewster caused a number of instruments to be prepared for execution by the heirs, among which was a general release by the plaintiff individually and as executrix of Louis S. J. Brewster. The papers to be signed by the plaintiff were handed by him to the plaintiff at his office on the 9th of May. He wanted her to sign the papers there. This she would not do, but took them down to Mr. Roosevelt's office. He and his partner Jones examined them, and objected to certain recitals therein. Mr. Roosevelt went with the plaintiff to the office of Mr. Townsend, the lawyer of Seabury Brewster, and there the papers were signed by the plaintiff in Mr. Brewster's presence, at which time the plaintiff turned round, and said to him: "You know, uncle, I am doing this entirely to please you, and relying upon your promise to make it good to me hereafter." Mr. Brewster either nodded his head, or said, "All right," and the papers were signed. At this time the two unrecorded deeds were produced, and Mr. Brewster obliterated the signature upon them, and wrote over them, "Canceled." The sum stated in the release was paid to the plaintiff. At this time Mme. de Terrouenne had not executed any papers, (except, perhaps, approving an account.) She afterwards signed on the 12th day of May, 1881, similar papers.

Mr. Brewster lived a little over three years after the execution of these papers, and died leaving a will dated September 8, 1884, containing five articles, by the first of which he bequeaths the sum of $1,000 each to Henry B. Brewster, Mme. de Terrouenne, and the plaintiff; by the second article he bequeathed $5,000 each to the six persons therein mentioned; by article 3 he gave to William C. Brewster $100,000; by article 4 he gave an annuity of $1,000 to James H. McWilliams; and by article 5 he directed the residue of his estate to be divided according to the laws of the state of New York. The executors caused this will to be duly proved, and the value of the estate in the hands of the executors amounts to the sum of $389,000.

The plaintiff presented a claim against the estate of Seabury Brewster, which was disputed by the executors, and thereupon brought this action. The complaint alleged that Seabury Brewster had not kept and performed his promise and agreement, and did not make the provision for her by will which he represented he would, and which he agreed to make; that he died seised and possessed of a large estate, and the plaintiff's share would have been not less than $50,000, if he had kept and performed his promise and agreement; and demanded judgment against the defendant for the sum of $50,000. The jury found a verdict for the plaintiff for $57,681, being the sum of $46,517 for principal, and $11,164 interest.

During the progress of the trial, various exceptions having been taken, the court ordered these exceptions to be heard in the first instance at the general term, the judgment in the mean time to be suspended. In the consideration of the questions brought on this motion for a new trial because of the exceptions, it only seems to be necessary to consider one exception which was taken to the charge. There are other exceptions in support of which much might be said; but, the one to which attention is to be called seeming to be a radical error in reference to the rule of damages, it is not necessary to consider the others. As already stated, this action was brought to recover the damages which the plaintiff had received by reason of the breach of the agreement made by Seabury Brewster at the time he received from the plaintiff the formal release hereinbefore mentioned, whereby he agreed he would leave the plaintiff an equal share of his estate with the two surviving children of Christopher S. Brewster, and that such amount would be more than sufficient to compensate her for any loss that she had sustained by reason of the non-renting of the premises above referred to. It seems to be clear, therefore, that the question as to what the loss of rents amounted to, or as to whether there was

any legal liability upon the part of Seabury Brewster for this loss of rent, was entirely immaterial.

A claim was made against Seabury Brewster upon the settlement of the estate of his brother for the loss of rent, and it was in order to procure a settlement of this claim that he made the promise as to which evidence was given. This promise was not a promise of indemnity, as it seems to have been treated in the court below. But it was a distinct, independent agreement, whereby he agreed, in case the plaintiff would sign the general release in question, that the plaintiff and Harry and Kate should share equally in his estate, and receive the bulk of it. The plaintiff claims that, relying upon this agreement, she signed the release. It is true that in connection with this matter Mr. Brewster said she would lose nothing by signing the papers. But it is apparent that the reason she would lose nothing was because he would make her a co-heir with Harry and Kate, his nephew and niece; that he was possessed of a large estate, and her interest as co-heir would more than repay the claim made against him because of the failure to rent the premises in question. The use of the expression, "She would lose nothing," referred to the fact that his estate was probably sufficiently large to more than compensate her, as already stated. This promise, however, was not in the nature of an indemnity. It was an independent agreement to do something in consideration of the making of this general release. Therefore the question as to the amount of the claim which the plaintiff released to Seabury Brewster was entirely immaterial. If the plaintiff established the parol agreement, then she was entitled to recover the damages which she sustained by the breach thereof. But she was in no way entitled to recover beyond that which would have been hers had the promise or agreement in reference to the giving to herself, Harry, and Kate the bulk of his estate been performed. The action was not for damages for the neglect of Brewster in renting the premises, but it was to recover damages sustained by the breach of the agreement made at the time of the signing of the release. This seems to have been lost sight of in the submission of the case to the jury, because the learned judge charged the jury that, if they found that the agreement claimed by the plaintiff had been entered into by Seabury Brewster, and that Brewster violated this agreement, then the plaintiff was entitled to be compensated for what she had given up on the faith of that promise, viz., the amount of the rents which had been given up by the general release entered into upon the faith of the promise; and the court further charged that, if the plaintiff had made out the contract upon which she relied, she was entitled to be indemnified, and to receive what she gave up at the time of the execution of the release, viz., the amount of the rents which had been lost, and which had been computed at the sum of $46,517. To these portions of the charge exceptions were duly taken.

This seems to have been clearly error. There was no question in the case as to her right to recover the amount of the rents which had been lost. There was no question about indemnifying the plaintiff for what she had given up by the release. The only question after the agreement between the plaintiff and Seabury Brewster had been established was what damage she had sustained by reason of the breach of that agreement by Seabury Brewster. That was the cause of action set up in the complaint. Leaving the release in full force and effect, a recovery was sought to be had for the damages which the plaintiff had sustained by reason of the breach of the agreement by Seabury Brewster with her, which formed a part of the consideration of that release. We think there was a fundamental error in submitting the question to the jury as a matter of indemnity. The plaintiff's only claim was based upon what share she would have received of Seabury Brewster's estate had he kept his agreement. It was entirely immaterial as to what the amount of the rents was. That was altogether a subordinate consideration, and had no effect whatever upon the question as to the amount of the damage. The sub-

mission of the case to the jury upon the ground that it was a matter of in-
demnity, and that the plaintiff was entitled to recover the amount lost by the
non-renting of these premises, was submitting an issue not embraced within
the cause of action set out in the complaint, and with which the jury had
nothing to do. The only amount which the plaintiff could recover was de-
pendent upon the amount of Seabury Brewster's estate, and it was immate-
rial, if the agreement was established to the satisfaction of the jury, whether
Seabury Brewster was legally liable to her for the loss of rent, for $10,000,
or $20,000, or $100,000.

Although the cause of action seems to have been correctly set forth in the
complaint, yet still, during the progress of the trial, the parties seem to have
drifted off into the discussion and consideration of issues which were in no
respect presented by the pleadings, and the case seems to have turned upon a
question as to whether it had been legally established that Seabury Brewster
had been guilty of neglect in his custody of the property which had been com-
mitted to his care. It was immaterial what his legal liability was. A claim
was presented against him. That claim was a colorable one, at least, and it
was settled by the entering of the parties into this release. The claim, what-
ever it was, was thereby released, and it is to recover damages for failure to
perform the independent agreement forming part and parcel of the consider-
ation of this release that this action was brought. This fact seems to have
been lost sight of, and because of this many of the complications which are
displayed upon this record seem to have arisen.

The only other question which it is necessary to consider is that which goes
to the foundation of the cause of action, viz., that the court erred in admitting
evidence to prove, or tending to prove, the parol agreement between the
plaintiff and Seabury Brewster, upon which the cause of action alleged in
the complaint depends. It is claimed by the defendants that "the release of
the plaintiff was under seal, and in her capacity as executor and individually,
and it was absolute. Its legal effect was to destroy and release and discharge
the testator from all claims and demands against him, including those for his
neglect (if any) to lease the buildings in question on the part of Louis S. J.
Brewster and the plaintiff, either as his executor or individually. All evi-
dence tending to prove the alleged verbal agreement by the testator alleged in
the complaint and found by the jury was therefore inadmissible, because it
was utterly inconsistent with and directly contradicted the release, and de-
stroyed its legal effect; that it is absolutely impossible that the release and
parol agreement can co-exist in force. They cannot stand together. One or
the other must fall. One of them destroys the other; and that, if the parol
agreement was valid and enforceable, the release was worthless, inoperative,
and ineffectual. Though its clear and unambiguous language covered the
claim in question, yet *quoad* that claim it was waste paper. If the release
was valid and operative, there was no claim or demand of any kind on the
part of the plaintiff, as executor or individually, from the instant of its deliv-
ery. There is no doubt that, if the parol agreement which forms the basis of
this action is necessarily inconsistent with the terms of the release, the terms
of the written instrument must control. But we think that it can be plainly
shown that the parol agreement is not inconsistent with the release; neither
does it directly or indirectly contradict the same, or destroy its legal effect.
Confusion here again arises because of the confounding of the claim released
by the release and the claim sought to be enforced in this action. The release
undoubtedly destroyed, released, and discharged the testator from all claims
and demands against him, including those for his neglect to release the build-
ings in question. That was one of the main objects of the release. It was
given for that purpose, and it had that effect; and it was for that reason that
in this action no recovery could be had upon the part of the plaintiff for any
damages sustained by reason of this neglect. The release was a bar to that

claim. But no such cause of action is contained in the complaint. It was for a cause of action which sprang into existence because of the giving of that very release.

The evidence in this case, which we must assume to be correct in view of the verdict of the jury, shows that at the time of the giving of this release a certain parol agreement was entered into between Seabury Brewster and the plaintiff, which formed part of the consideration of that release. Now, it is idle to say that, if this parol agreement was entered into as part and parcel of the consideration of this general release, the general release released Seabury Brewster from all the duties and obligations arising from that parol agreement. Suppose, for example, that there had been a recital in the release that it was executed in consideration of the payment of $96,000, and the execution by Brewster of an agreement of the same character as the parol agreement was proved to be, could it be for a moment claimed that the release had discharged the agreement which had been entered into at the same time? Clearly not, because the existence of the release itself contemplated the existence of the contemporaneous agreement after the release had subserved all its purposes. How do the parties stand in any different relation because the agreement was a parol agreement? If it had been a written agreement, it would have been a legal agreement; if it was by parol, it was a legal agreement; and, being such, it stands in precisely the same condition as though it had been written in as part of the consideration of the general release. It is familiar law that the consideration of a release may be shown, and this parol agreement, forming part of the consideration of the release, was independent, separate, and distinct from the release, and in no manner inconsistent with its terms. The release purported to release all claims from the beginning of the world to the day of the date of the release. The parol agreement had no valid existence until the execution of the general release, and, clearly, the general release was intended to and did act only upon claims which existed prior to its execution. No right by reason of any parol agreement between Seabury Brewster and the plaintiff sprang into existence until the time of the execution, and by "execution" I mean signing and delivery of the release. Therefore, by its very language, this parol agreement, if it existed, was excluded from the terms of the general release. Suppose, instead of making the agreement which he did in consideration of the plaintiff's signing this release, he had given her a note payable at a future day, could it be said that that note was released because of the language of this general release? Clearly not. Such was not the intention of the parties, and such is not the language of the instrument. The parol agreement and the release formed part and parcel of one transaction. They were not inconsistent with each other. One formed the consideration for the other, and upon each did the legal existence of the other depend.

The case of *Stearns* v. *Tappin*, 5 Duer, 294, in no way conflicts with the views expressed. In that case it had been attempted to prove a promise to pay, at a future day, the debt which was to be released by the release itself. This was clearly inconsistent with the operation of the release, and contradicted its terms and legal effect. In the case at bar there was no promise to pay the amount of the claim which was made against Mr. Brewster for the loss of these rents. If that had been the nature of the promise, then, clearly, there could be no recovery; and this consideration only emphasizes the error committed on the trial in allowing the question as to the amount of the rents to be considered. But Mr. Brewster promised to do something which had no relation or connection with the payment of the claim made against him for the loss of rent. He made a contract or agreement in respect to the way in which he would make his will if this release was signed; and it was relying upon this promise that the plaintiff signed the release. As already stated, Seabury Brewster did not agree to pay the amount of these rents. But he

agreed to do something else, which was entirely consistent with the existence of the release, and had no relation to the claim discharged by the release, and consequently was in no way contradictory of the terms of the release, or its legal effect. We think, without pursuing this discussion further, that a cause of action existed in favor of the plaintiff, dependent upon her establishment to the satisfaction of the jury of the contract made with her by Seabury Brewster at the time of the execution of this release; but that the question as to the amount of these rents, or what had been lost by reason of these rents, was not a question which could be considered by the jury, and that it was error to present that question to the jury in reference to the amount of damages which the plaintiff would have a right to recover. That depended entirely upon the amount of Brewster's estate. By the submission to the jury of the question as to the loss of rents, the release is sought to be rendered inoperative, without a rescission of the same having been claimed in any respect upon the part of the plaintiff. The exceptions must therefore be sustained, and a new trial ordered, with costs to defendant to abide event. All concur.